Urs Broderick Furrer, Esq.
Harriton & Furrer, LLP
84 Business Park Drive, Suite 302
Armonk, New York 10504
(914) 730-3400
Attorneys for Plaintiffs Lehigh Gas
Wholesale, LLC, Lehigh Gas Wholesale
Services, Inc., LGP Realty Holdings LP

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| LEHIGH GAS WHOLESALE LLC,<br>LEHIGH GAS WHOLESALE SERVICES, INC.,<br>LGP REALTY HOLDINGS LP, | )<br>)<br>)<br>) |
| Plaintiffs, | )<br>) **COMPLAINT**<br>) |
| v. | ) Civil Action No.:<br>) |
| MNR ENTERPRISE LLC<br>and MICHEL K. NASSIF, | )<br>)<br>) |
| Defendants. | )<br>) |

Plaintiffs Lehigh Gas Wholesale LLC ("Lehigh Gas Wholesale"), Lehigh Gas Wholesale

Services, Inc. (Lehigh Gas Wholesale Services"), and LGP Realty Holdings LP ("LGP Realty")

(collectively "Lehigh"), by their attorneys Harriton & Furrer, LLP, as and for their Complaint herein,

allege as follows:

**I.    Jurisdiction**

1.    This Court has jurisdiction pursuant to 28 U.S.C. § 1332 because there is complete

diversity among the parties and the amount in controversy exceeds $75,000.00, exclusive of

interest and costs.

2.    This Court also has jurisdiction pursuant to 28 U.S.C. §1331 as a federal question

arises under the Petroleum Marketing Practice Act, 15 U.S.C. §2801 et seq. ("PMPA"), as well as

other claims arising under the Constitution and laws and statutes of the United States.

3.    This Court has ancillary jurisdiction over Lehigh's state law claims.

4.      Venue is proper in this District pursuant to 28 U.S.C. § 1391(a), (b) and (c) because a substantial part of the events giving rise to the claims occurred in this District.

5.      The controversies in this case are justiciable, capable of disposition and Lehigh has a personal stake in the outcome.

## II.     The Parties

6.      Lehigh Gas Wholesale, Lehigh Gas Wholesale Services, and LGP Realty are all Delaware entities with their principal place of business at 600 Hamilton Street, Suite 500, Allentown, Pennsylvania. They are all authorized to do and doing business in the Commonwealth of Massachusetts.

7.       Upon information and belief, Defendant MNR Enterprise LLC ("MNR") is a Massachusetts corporation which maintains a place of business at 484 Broadway, Methuen, Massachusetts, 01844 ("the Premises" or "the Site" or "the Property").

8.      Upon information and belief, Defendant Michel K. Nassif ("Nassif") is the managing member of Defendant MNR and resides at 563 Highland Street, Stoughton, Massachusetts.

9.      Lehigh, through its various affiliate entities, is engaged in the marketing and distribution of petroleum products in the Commonwealth of Massachusetts and certain other states. Among their activities, Lehigh sells automotive gasoline and other related products to service station dealers as well as commission dealers and leases service station properties that Lehigh either owns or rents to dealers under service station lease agreements.

## III.    Site History

10.     Upon information and belief, from in or about April 2012 through October 2018, Defendant MNR and/or Nassif had a revocable license to occupy the Property.

11.     In or around October 2018, Lehigh offered Defendants MNR and/or Nassif a PMPA Franchise Agreement, which included a Fuel Supply Agreement, Lease Agreement and

Proprietary Marks Agreement.

12.     Thereafter, effective December 6, 2018, Defendant MNR entered into a PMPA Franchise Agreement with Lehigh Gas Wholesale and Lehigh Gas Wholesale Services, which included a Fuel Supply Agreement with Lehigh Gas Wholesale as well as a Lease Agreement, and Proprietary Marks Agreement with Lehigh Gas Wholesale Services. The term of the Franchise Agreement was three (3) years commencing on December 6, 2018 and expiring on December 5, 2021. The Branded Distributor for the Station is BP and, since that time, the station has been branded BP. A true and accurate copy of the Franchise Supply Agreement is attached hereto as Exhibit "A", the Lease Agreement is attached hereto as Exhibit "B", and the Proprietary Marks Agreement and Equipment Lease is attached hereto as Exhibit "C".

**IV.     The Terms and Conditions of the Franchise Agreement**

      **A.     Fuel Supply Agreement with Lehigh Gas Wholesale**

13.     Pursuant to the Fuel Supply Agreement, Lehigh Gas Wholesale agreed to supply and MNR agreed to purchase petroleum products to be offered for retail sale at the Site. *See* Exhibit A, Section 1.1.

14.     In connection therewith, MNR agreed to "use good-faith and best efforts to maximize" the sale of petroleum products at the Site and specifically agreed to purchase the minimum volume of products specified in the Purchase Schedule ("Contract Volumes"). *Id.* Section 2.1(a) and (b).

15.     The Purchase Schedule required MNR to purchase 452,640 gallons of petroleum products annually, and 1,357,920 gallons over the term of the Fuel Supply Agreement. *Id.*, Purchase Schedule.

16.     MNR agreed to pay all amounts due under the Fuel Supply Agreement in United States currency and in the manner specified by Lehigh Gas Wholesale and was required to pay

all such sums "prior to the delivery and provision of such Products and services." *Id.* Section 2.3.

17.    The Fuel Supply Agreement specifically indicated that, "[t]he method of payment specified by Distributor may include Distributor's electronic settlement program, automated direct debit system, application by Distributor of Franchise Dealer's credit card proceeds delivered to Distributor by Branded Supplier, certified check, bank or other financial institution check or any other method as Distributor may designate from time to time."   Indeed, MNR was required to "provide written authorization as required for such payment methods and [to] maintain sufficient funds in its designated accounts to fund such payments."   *Id.*, Section 2.3.

18.    The Fuel Supply Agreement also explicitly stated that, "Distributor may charge, and Franchise Dealer shall pay, fees as Distributor may from time to time specify and as are permitted by applicable federal, state and local laws and regulations ('Law'), for any late payments, for any checks or bank or other financial-institution debits that are not honored by Franchise Dealer's bank or other financial institution   or are otherwise returned or reversed by Franchise Dealer's bank or financial institution." As a result of any dishonored checks or debits, Lehigh Gas Wholesale was permitted to charge and MNR was required to pay fees as Lehigh Gas Wholesale specified from time to time, as permitted by Law, which fees were to be determined by Lehigh Gas Wholesale to recoup its costs and expenses in administering MNR's payments under the Fuel Supply Agreement. *Id.*, Section 2.3.

19.    Lehigh Gas Wholesale offered MNR the benefit of paying on credit terms at the inception of the Fuel Supply Agreement. *See* Exhibit A, Credit Provisions. Indeed, in its sole discretion, Lehigh Gas Wholesale was permitted to extend MNR credit subject to terms and conditions specified by Lehigh Gas Wholesale. *See* Exhibit A, Section 2.4. Pursuant to the Credit provisions, MNR was required to provide Lehigh Gas Wholesale with security in the amount of Twenty Five Thousand Dollars ($25,000.00). *See* Exhibit A, Credit Provisions.

20.     Lehigh Gas Wholesale was permitted to modify and/or revoke the offer of credit in its sole discretion. *Id.*, Section 2.4; Credit Provisions. Indeed, the Credit Provisions specifically stated that, "[i]f Franchise Dealer defaults in the payment of any obligation or indebtedness to Distributor or any related or affiliated entities, or otherwise fails to comply with any credit terms imposed by Distributor, Distributor may without notice or demand, in addition to any other rights it may have (including termination or non-renewal of this [Fuel Supply] Agreement, any Related Agreement and the Franchise Relationship): (a) immediately suspend deliveries of all Products; and (b) apply any security which Franchise Dealer may have given to Distributor to the payment of the indebtedness or obligation."   *See* Exhibit A, Credit Provisions.

21.     Indeed, it was specifically set forth in the Fuel Supply Agreement that, "[i]f at any time the financial responsibility of Franchise Dealer shall be deemed impaired or unsatisfactory to Distributor, or should Franchise Dealer be in arrears in Franchise Dealer's account(s) with distributor or with any related or affiliated entities of Distributor, including without limitation LGW Services or Landlord[,] Distributor may require, as a condition of making further deliveries under this Agreement, payment by Franchise Dealer of all past due accounts and cash payment for all future deliveries and/or the posting of security by Franchise Dealer in such form and amount as determined by Distributor." *See* Exhibit A, Section 2.3.

22.     In addition, MNR was required to "use the dispensing and storage facilities located at the Marketing Premises for the storage and sale of the Products bearing the Branded Supplier name and Proprietary Marks Franchise Dealer has been authorized to use under the Proprietary Marks Agreement."   The Fuel Supply Agreement stated that MNR was required to "purchase and resell the Products, and use the Proprietary Marks, brand names and packaging Franchise Dealer has been authorized to use under the Proprietary Marks Agreement."   *See* Exhibit A, Section 2.6.

23.    The Fuel Supply Agreement also required MNR to "[c]omply with any procedures developed by Branded Supplier or Distributor from time to time to safeguard the integrity of all Products sold from the Marketing Premises…" *Id.*, Section 2.8(d). Indeed, it specifically provided that, "Franchise Dealer shall operate the Businesses in strict conformity with the guidelines, methods, procedures, standards and specifications as Branded Supplier or Distributor may prescribe from time to time." *See* Exhibit A, Section 5.1.

24.    Furthermore, the Fuel Supply Agreement stated that, "Franchise Dealer shall, at Franchise Dealer's expense, maintain the Marketing Premises and all adjacent areas in good repair and safe condition including making all repairs, replacements, alterations, additions, periodic cleaning, landscaping, repainting, replacing obsolete signs, equipment and fixtures and complying with the Guidelines and such other methods, procedures, standards and specifications as Branded Supplier or Distributor may prescribe from time to time in writing." *Id.,* Section 5.4. The following was also provided, "Franchise Dealer, at its expense, shall comply with Branded Supplier's and/or Distributor's minimum image requirements ('Image Requirements')…." *See* Exhibit A, Section 5.5(a).

25.    In addition, the Fuel Supply Agreement indicated that, "At all reasonable times, Franchise Dealer shall permit Distributor and/or Branded Supplier, their respective affiliates, contractors, employees and agents to enter and inspect the Marketing Premises, including any and all records relating to the Motor Fuels Business and/or Related Businesses (if any) or required to be maintained under this Agreement, to determine compliance with this Agreement and Law….Upon notice from Distributor of any deficiencies detected in an inspection, Franchise Dealer promptly shall take such steps as may be necessary to correct the deficiencies including the  temporary closing of the Marketing Premises if so directed by Distributor." *See* Exhibit A, Section 5.13.

26.     Moreover, MNR was required to keep the Station "open and in normal operation" and "maintain an inventory of Products sufficient to serve customers" during the above-referenced operating hours. *See* Exhibit A, Sections 5.3(b) and 5.15.

27.     The Fuel Supply Agreement provided that, "If Franchise Dealer defaults on any obligation contained in this Agreement or of the Related Agreements, Distributor may, but is not obligated to, exercise any or all of its rights under this Agreement or available at law or in equity, including but not limited to the following remedies, whether or not Distributor exercises its right to terminate or non-renew: (a) Suspend all deliveries of Products to Franchise Dealer until the default is corrected or remedied; and/or (b) Apply any sums or security furnished by Franchise Dealer to distributor under this Agreement, or to any of its Affiliates under any of the Related Agreements, to the payment of any indebtedness. Franchise Dealer immediately shall provide additional security, as directed by Distributor, to replace the sums or security applied by Distributor." *See* Exhibit A, Section 9.3.

28.     Lehigh Gas Wholesale had the discretion to terminate the Fuel Supply Agreement if MNR:   "(a) …fails to comply with any provision of [the Fuel Supply Agreement], which provision is both reasonable and of material significance to the Franchise Relationship, including without limitation those provisions specifically identified as such in [the] Agreement; and (b) [u]pon the occurrence of an event which is relevant to the Franchise Relationship and as a result of which the termination of [the] Agreement, the Franchise Agreement and the Franchise Relationship [wa]s reasonable, including: …

(iv)   if Franchise Dealer fail[ed] to pay in a timely manner any sums when due…

(ix)   if Franchise Dealer (if an individual) or Key Individual(s) fail[ed] to operate the Marketing Premises for seven (7) consecutive days, or any shorter period of time which, taking into account the facts and circumstances, amounts to an unreasonable period of time not to operate the Marketing Premises;

(x) If there occur[ed] any other circumstance under which termination of a franchise

7

[wa]s authorized under the provisions of the Petroleum Marketing Practices Act (15 U.S.C. 2802)…"   *See* Exhibit A, Section 9.1 (a) and (b).

29.    Upon termination of the Fuel Supply Agreement, MNR was required to: (1) "stop all operation[s] of the Motor Fuels Business" including immediately stopping the operation of the "Motor Fuels Business and the Related Businesses" and returning "all Branded Supplier and other personal property of Branded Supplier" to Lehigh Gas Wholesale; and (2) immediately pay all sums owing to Lehigh Gas Wholesale and its affiliates and all indebtedness to Lehigh Gas Wholesale Services.   *See* Exhibit A, Section 10.1(a), (c) and (d).

30.    Finally, MNR agreed to "promptly reimburse Distributor on demand for all costs, fees (including attorneys and expert witness fees), and expenses incurred by Distributor in enforcing its rights or remedies under [the] Agreement including, but not limited to, those expenses incurred in defending any unsuccessful claim by Franchise Dealer against Distributor under this or any Related Agreement and any expenses incurred by Distributor in successfully prosecuting any claim against Franchise Dealer under this or any Related Agreement."   *See* Exhibit A, Section 15.5.

**B.    Lease Agreement with Lehigh Gas Wholesale Services**

31.    At or about the same time that MNR entered into the Fuel Supply Agreement with Lehigh Gas Wholesale, it entered into a Lease Agreement with Lehigh Gas Wholesale Services. Pursuant to the Lease Agreement, Lehigh Gas Wholesale Services agreed to lease to MNR the Property for a term of three (3) years that coincided with the term of the Fuel Supply Agreement, December 6, 2018 through December 5, 2021. *See* Exhibit B, Section 1.2.

32.    The Lease Agreement required MNR to pay rent in the amount outlined in Exhibit 2.1.   *See* Exhibit B, Sections 2.1 and 2.3; Exhibit 2.1 (Rent Schedule).

33.    In addition to rent, MNR was required to pay to Lehigh Gas Wholesale Services: (1) all utility charges and other expenses incurred in the operation of the Property including water

and sewer charges; (2) all taxes, fees and charges imposed by governmental authority on the Property or its use or the Lease including use and occupancy taxes, business use taxes, license fees and real property taxes on the land, buildings and other improvements; (3) the costs of fire and extended coverage insurance in an amount sufficient to cover the full replacement costs of the building(s) and other improvements on the Property; and (4) all taxes, fees and charges imposed by governmental authority relating to the businesses, including those measured by income as well as sales and use and personal property taxes on MNR's personal property and equipment or any leased personal property or equipment. *See* Exhibit B, Section 3.1.

34.     The Lease Agreement required MNR to "regularly maintain and promptly repair and replace, at Tenant's sole expense, all fixtures, buildings and improvements located at the Property" except as otherwise provided.   *Id.*, Section 4.1.   Furthermore, the Proprietary Marks Agreement stated that, "Subject to the terms of the Lease Agreement and the Equipment Lease, Lease Franchise Dealer shall, at Franchise Dealer's expense, maintain the Marketing Premises and all adjacent areas in good repair and safe condition including making all repairs, replacements, alterations, additions, periodic cleaning, landscaping, repainting, replacing obsolete signs, equipment and fixtures and complying with the Guidelines and such other methods, procedures, standards and specifications as Branded Supplier or Distributor may prescribe from time to time in writing." *See* Exhibit C, Section 5.2.

35.     The Lease Agreement provided that, "In an Event of Default shall have occurred, Landlord may, at its option and without any further notice to Tenant:

> "(a)     Declare due and payable and sue for and recover, all unpaid Rent for the unexpired period of the Term (and also all Additional Rent and other rent as the amount(s) of same can be reasonably determined or reasonably estimated) as if by the terms of this Lease the same were payable in advance, together with all legal fees and other expenses incurred by Landlord in connection with the enforcement of any of Landlord's rights and remedies hereunder, and/or

> "(b)     Distrain, collect or bring action for such Rent, Additional Rent and other

rent as being rent in arrears, or may enter judgment therefore in an amicable action as herein elsewhere provided for in case of rent in arrears or may file a proof of claim in any bankruptcy or insolvency proceeding for such Rent, Additional Rent and other rent or institute any other proceedings, whether similar or dissimilar to the foregoing, to enforce payment thereof, and/or

"(c)     Terminate the Term by giving written notice thereof to tenant and, upon the giving of such notice, the Term and the estate hereby granted shall expire and terminate with the same force and effect as though the date of such notice was the date hereinbefore fixed for the expiration of the Term, and all rights of Tenant hereunder shall expire and terminate but tenant shall remain liable as hereinafter provided, and/or

"(d)     Exercise any remedies provided to Landlord in this Lease, and/or

"(e)     Exercise any other rights and remedies available to Landlord at law or in equity."   *See* Exhibit B, Section 10.1.

36.     Lehigh Gas Wholesale Services also had the discretion to terminate the Lease Agreement upon the occurrence of any of the following events:

(1)   MNR failed to pay any installment of rent on the day it was due;

(2)   MNR failed to comply with any provision of the Lease Agreement, which provision was both reasonable and of material significance to the Franchise Relationship including, but not limited to, those provisions specifically identified as such in the Lease Agreement;

(3)   MNR defaults under any of the Relevant Agreements, including but not limited to Fuel Supply Agreement and Proprietary Marks Agreement.   *See* Exhibit B, Section 9.1(a), (d), (e).

37.     Upon the termination of the Lease Agreement, MNR is required to surrender to Lehigh Gas Wholesale Services the Property in broom-clean condition and in the condition and good repair as the Property existed upon the commencement of the Lease Agreement subject only to reasonable wear and tear. *Id.*, Section 3.5. Indeed, the Lease Agreement specifically provided that, in the event of default, whether or not the Agreement had been terminated, Lehigh Gas Wholesale Services was permitted to reenter and repossess the Property or any part thereof by force, summary proceedings, ejectment or otherwise and had the right to remove all persons and property therefrom. *See* Exhibit B, Section 10.2.

38.     Moreover, the Lease Agreement specifically provided that:

"10.5   In the event of any expiration or termination of this Lease or repossession of the property or any part thereof by reason of an occurrence of an Event of Default, and Landlord has not elected to accelerate rent pursuant to Section 10.1(a), Tenant shall pay to Landlord the Rent, Additional Rent and rent and other sums required to be paid by Tenant to and including the date of such expiration, termination or repossession; and whether or not the Property or any part thereof shall have been relet, be liable to Landlord for, and shall pay to Landlord, as liquidated and agreed current damages, the Rent, Additional Rent, rent and other sums which would be payable under this Lease by Tenant in the absence of such expiration, termination or repossession less the net proceeds, if any, of any reletting effected for the account of Tenant pursuant to Section 10.3, after deducting from such proceeds all of Landlord's reasonable expenses in connection with such reletting (including, without limitation, all related repossession costs, brokerage commissions, legal expenses, attorneys' fees, employees' expenses, alteration costs and expenses of preparation for such reletting). Tenant shall pay such current damages on the days on which the Rent, Additional Rent and other sums required to be paid by Tenant would have been payable under this Lease in the absence of such expiration, termination or repossession, and Landlord shall be entitled to recover the same from Tenant on such day."   *See* Exhibit B, Section 10.5.

39.     The Lease Agreement further stated that:

"10.6   At any time after such expiration or termination of this Lease or repossession of the Property or any part thereof by reason of the occurrence of an Event of Default, whether or not Landlord shall have collected any current damages pursuant to Section 10.5, Landlord shall be entitled to recover from Tenant, and Tenant shall pay to Landlord on demand, unless Tenant has paid the whole of accelerated rent pursuant to Section 10.1(a), as and for liquidated and agreed final damages for such Event of Default and in lieu of all current damages beyond the date of such demand (it being agreed that it would be impracticable or extremely difficult to fix the actual damages), an amount equal to the excess, if any, of (i) Rent, Additional Rent, rent and other sums which would be payable under this Lease for the remainder of the Term from the date of such demand (or, if it be earlier, the date to which Tenant shall have satisfied in full its obligations under Section 10.5 to pay current damages) for what would have been the then unexpired term of this Lease in the absence of such expiration, termination or repossession, discounted at the rate of six percent (6%) per annum, or (ii) the then fair rental value of the Property for the same period, discounted at a like rate. If any Law shall validly limit the amount of such liquidated final damages to less than the amount above agreed upon, Landlord shall be entitled to the maximum amount allowable under such Law."   *See* Exhibit B, Section 10.6.

40.     MNR also expressly authorized any clerk or any attorney of any court of record

following an event of default to accept service of process for, to appear for and to confess

judgment against it in any action brought by Lehigh Gas Wholesale Services to: (1) recover possession of the property (in ejectment or otherwise); or (2) enforce payment of any sums owed to Lehigh Gas Wholesale Services under the Lease Agreement (including rent, accelerated rent or otherwise) with ten percent (10%) of such sums (but in no event less than ten thousand dollars ($10,000.00)) added thereto as attorneys' collection fee. *See* Exhibit B, Section 10.12.

41.     Finally, MNR also agreed to pay all of Lehigh Gas Wholesale Services "costs, charges and expenses, including the fees and expenses of legal counsel, agents and others retained by Landlord incurred in enforcing Tenant's obligations [under the Lease Agreement] or incurred by Landlord in any litigation, negotiation or transaction in which Tenant causes Landlord, without Landlord's fault, to become involved or concerned." *See* Exhibit B, Section 10.11. Indeed, the Lease Agreement further provided that, "Tenant will promptly reimburse Landlord on demand for all costs, fees (including attorneys and expert witness fees), and expenses incurred by Landlord in enforcing its rights or remedies under this Lease including, but not limited to, those expenses incurred in defending any unsuccessful claim by Tenant against Landlord under this or any related agreement and any expenses incurred by Landlord in successfully prosecuting any claim against Tenant under this or any related agreement." *See* Exhibit B, Section 16.9.

### C.    Proprietary Marks Agreement with Lehigh Gas Wholesale Services

42.     At or about the same time that MNR entered into the Fuel Supply Agreement with Lehigh Gas Wholesale and the Lease Agreement with Lehigh Gas Wholesale Services, it entered into the Proprietary Marks Agreement also with Lehigh Gas Wholesale Services wherein Lehigh Gas Wholesale Services granted MNR the right to use certain proprietary marks in connection with the operation of the Station for a term of three (3) years beginning on December 6, 2018 and ending on December 5, 2021.   *See generally* Exhibit C; *Id.*, Sections 1.1 and 1.5.

43.     While using the proprietary marks, MNR was required to operate the Station

responsibly, with due care, prudence, good judgment and skill and to promote diligently the sale of motor fuel from the Property. *Id.*, Article V.

44.     By executing the Proprietary Marks Agreement, MNR represented and warranted that it had conducted an independent investigation of the business and recognized that the business involved business risks and that its success would be largely dependent upon the ability of MNR and/or Nassif as an independent businessperson. Lehigh Gas Wholesale Services expressly disclaimed the making of, and MNR represented that it had not received, any representation, warranty or guarantee, express or implied, as to the potential volume, profits or success of the Station.   *See* Exhibit C, Section 12.1.

45.     The Proprietary Marks Agreement provided that, "If Franchise Dealer defaults on any obligation contained in this Agreement or any Related Agreement, Grantor may, but is not obligated to, exercise any or all of its rights under this Agreement or available at law or in equity, including but not limited to the following remedies, whether or not Grantor exercises its right to terminate or non-renew: (a) Suspend Franchise Dealer's right to use the Proprietary Marks until the default is corrected or amended; and/or (b) Apply any sums furnished by Franchise Dealer to Grantor under this Agreement or any Related Agreement to the payment of any indebtedness." *See* Exhibit C, Section 7.4.

46.     Upon termination of the Proprietary Marks Agreement, MNR was required to: (1) "stop all operation[s] of the Motor Fuels Business" including immediately stopping the operation of the "Motor Fuels Business and the Related Businesses," stopping the use, in any manner whatsoever, of any Confidential Information, Branded Supplier's name and all Proprietary Marks, including without limitation all signs, advertising, materials, displays, stationary and forms containing the Proprietary Marks and returning to Lehigh Gas   Wholesale Services all of its signs and other personal property; and (2) immediately pay all sums owing to Lehigh Gas Wholesale

Services and its affiliates and all indebtedness to Lehigh Gas Wholesale Services. *See* Exhibit C, Section 7.5.

47.     Upon the termination of the Proprietary Marks Agreement, MNR's rights to use the proprietary marks ceased and it was required to discontinue the posting, mounting, display and other use of the proprietary marks. *See* Exhibit C, Section 4.1(c).

48.     Exhibit 4.1 to the Proprietary Marks Agreement with Lehigh Gas Wholesale Services, the Equipment Lease, granted MNR the right to use certain of Lehigh Gas Whole Services' equipment, which the point-of-sale ("POS") terminals and customer activated terminals ("CATS"), in connection with the operation of the Station for a same three (3) years terms of the Proprietary Marks Agreement in exchange for the payment of rent. *See* Exhibit 4.1 (Equipment Schedule) to Proprietary Marks Agreement (Exhibit C).

49.     Finally, the Proprietary Marks Agreement provided that, "Franchise Dealer will promptly reimburse Grantor on demand for all costs, fees (including attorneys and expert witness fees), and expenses incurred by Grantor in enforcing its rights or remedies under this Agreement including, but not limited to, those expenses incurred in defending any unsuccessful claim by Franchise Dealer against Grantor under this or any Related Agreements and any expenses incurred by Grantor in successfully prosecuting any claim against Franchise Dealer under this or any related agreement." *See* Exhibit C, Section 11.5.

> **D.     The Personal Guaranty**

50.     Nassif personally guaranteed MNR's obligations under the Fuel Supply Agreement, Lease Agreement, Proprietary Agreement and all Relevant Agreements. *See* Exhibit 3.3 to Fuel Supply Agreement (hereinafter the "Personal Guaranty").

**V.     The Nature of the Controversy**

51.     In direct breach of the Fuel Supply Agreement, Lease Agreement and Proprietary

Marks Agreement, on or about August 12, 2019, Plaintiffs served MNR and Nassif with a Default Notice stating that MNR failed to sell product for twelve (12) consecutive days, failed to pay rent, and failed to maintain the fire suppression equipment at the Property.

52.     A Second Default Notice was sent to MNR and Nassif on or about November 4, 2019, stating that MNR failed to sell product since October 17, 2019, failed to pay rent, failed to pay for petroleum products delivered to MNR, and failed to maintain the fire suppression equipment at the Property

53.     To date, MNR is not operating the Station, has not paid any rent, and has not paid any of its outstanding balance that it is indebted to Plaintiffs.

54.     In addition, MNR has not purchased any petroleum products from Lehigh Gas Wholesale since October 7, 2019.   Moreover, the last credit card payment received by Lehigh Gas Wholesale for sales at the Station was on October 17, 2019, indicating that as of at least that date, MNR had run out of and stopped selling petroleum product at the Site.

55.     On February 3, 2020, Plaintiffs sent MNR a Notice of Termination of the PMPA Agreement ("the Termination Notice") for failure to operate the Property for seven (7) consecutive days and for failing to timely pay the outstanding account balance of $49,053.40 for rent, maintenance and fuel charges. *See* Termination Notice attached hereto as Exhibit D. MNR was specifically advised that it was required to surrender the premises and personal property in accordance with the Fuel Supply Agreement, Lease Agreement and Proprietary Marks Agreement provisions and pursuant to the PMPA on February 10, 2020.

56.     Since service of the Termination Notice, MNR has failed and refused to surrender possession of the Property as well as the equipment on Site, has failed to resume purchasing petroleum products from Plaintiffs, has failed and refused to reimburse Lehigh for the amounts that were past due and owing to Lehigh and has continued to bounce drafts for charges due and

owing to Lehigh Gas Wholesale Services relating thereto including: (1) for rent and real estate taxes of $3,873.93 on February 6, 2020; and (2) maintenance charges in the total amount of $320.00.

57.     To date, MNR has not made any additional payments to Lehigh Gas Wholesale or Lehigh Gas Wholesale Services and, as of March 10, 2020, MNR was indebted to Lehigh Gas Wholesale Services in the amount of $36,705.70 and to Lehigh Gas Wholesale in the amount of $10,298.36.

58.     Accordingly, Plaintiffs bring this action seeking a declaratory judgment and preliminary and permanent injunctive relief including a temporary restraining order as well as monetary damages for breach of contract, conversion and trespass and a warrant for eviction as a result of the Defendants' wrongful conduct relating to the Premises.

## COUNT I
## BREACH OF CONTRACT

59.     Plaintiffs repeat, reallege and reassert the allegations set forth in paragraphs "1" through "58" as if fully stated herein.

60.     Defendant MNR's failure to purchase petroleum products from Lehigh since on or about October 7, 2019 constitutes a material breach of one or more provisions of the Fuel Supply Agreement, Lease Agreement and Proprietary Marks Agreement.

61.     By virtue of Defendant MNR's material breach of the Fuel Supply Agreement, Lease Agreement and Proprietary Marks Agreement, Lehigh have been damaged and will continue to be damaged in an amount which has not yet been finally determined but, in no case, less that the jurisdictional limit of this Court.

## COUNT II
## BREACH OF CONTRACT

62.     Plaintiffs repeat, reallege and reassert the allegations set forth in paragraphs "1"

through "61" as if fully stated herein.

63.     Defendant MNR's action in failing to pay money owed to Plaintiffs constitutes a material breach of one or more provisions of the Fuel Supply Agreement, Lease Agreement and Proprietary Marks Agreement.

64.     By virtue of Defendant MNR's material breach of the Fuel Supply Agreement, Lease Agreement and Proprietary Marks Agreement, Plaintiffs have been damaged and will continue to be damaged in an amount that has not yet been finally determined but, in no case, less that the jurisdictional limit of this Court.

## COUNT III
## BREACH OF CONTRACT

65.     Plaintiffs repeat, reallege and reassert the allegations set forth in paragraphs "1" through "64" as if fully stated herein.

66.     Lehigh Gas Wholesale Services has a right to possess the Premises.

67.     Lehigh Gas Wholesale Services duly, properly and validly terminated the Fuel Supply Agreement, Lease Agreement and Proprietary Marks Agreement and demanded that Defendant MNR quit and surrender said Premises.

68.     Notwithstanding the termination of the Fuel Supply Agreement, Lease Agreement and Proprietary Marks Agreement, Defendant MNR has held over beyond the termination of the Fuel Supply Agreement, Lease Agreement and Proprietary Marks Agreement and has refused to vacate and continues unlawfully occupy the Premises which constitutes a material breach of one or more provisions of the Fuel Supply Agreement, Lease Agreement and Proprietary Marks Agreement.

69.     By virtue of Defendant MNR's material breach of the Fuel Supply Agreement, Lease Agreement and Proprietary Marks Agreement, Plaintiffs have been damaged and will continue to be damaged in an amount that has not yet been finally determined but, in no case, less that the jurisdictional limit of this Court.

**COUNT IV**
**BREACH OF CONTRACT**

70.     Plaintiffs repeat, reallege and reassert the allegations set forth in paragraphs "1"

through "71" as if fully stated herein.

72.     Defendant MNR's action in failing to provide Plaintiffs as well as their servants, agents

and/or employees access to the Premises constitutes a material breach of one or more provisions

of the Fuel Supply Agreement, Lease Agreement and Proprietary Marks Agreement.

73.     By virtue of Defendant MNR's material breach of the Fuel Supply Agreement, Lease

Agreement and Proprietary Marks Agreement, Plaintiffs have been damaged and will continue to be

damaged in an amount which has not yet been finally determined but, in no case, less that the

jurisdictional limit of this Court.

**COUNT V**
**TRESPASS**

74.     Plaintiffs repeat, reallege and reassert the allegations set forth in paragraphs "1"

through "73" as if fully stated herein.

75.     The Lease Agreement between Lehigh Gas Wholesale Services and Defendant

MNR terminated on or about February 10, 2020, at which time MNR was immediately required to

vacate the Premises.

76.     Defendant MNR intentionally failed to vacate the Premises at the termination of the

Lease Agreement.

77.     To date, Defendant MNR has intentionally remained and continues to intentionally

remain on the Premises without authorization or permission, in violation of the Lease Agreement.

78.     As a result of Defendant MNR's continuing act of trespass, Plaintiffs have been

damaged and will continue to suffer damages for as long as Defendant MNR remains illegally at the

Premises in an amount yet to be finally determined but, in no case, less that the jurisdictional limit of

this Court.

## COUNT VI
## CONVERSION

79.     Plaintiffs repeat, reallege and reassert the allegations set forth in paragraphs "1"

through "78" as if fully stated herein.

80.     Defendant MNR's actions in selling Lehigh Gas Wholesale's petroleum products

without paying for such products constitute acts of conversion.

81.     By virtue of Defendant MNR's conversion, Plaintiffs have been damaged and will

continue to be damaged in an amount which has not yet been finally determined but, in no case, less

that the jurisdictional limit of this Court.

## COUNT VII
## DECLARATORY JUDGMENT

82.     Plaintiffs repeat, reallege and reassert the allegations set forth in paragraphs "1"

through "81" as if fully stated herein.

83.     As a result of all of the foregoing, Defendants MNR and Nassif have failed to exert

good faith efforts to carry out and are in breach of their obligations under the Fuel Supply Agreement,

Lease Agreement and Proprietary Marks Agreement, the terms and conditions of which are both

reasonable and of material significance to the relationships thereunder.

84.     Accordingly, on February 3, 2020, Plaintiffs delivered to Defendants MNR and Nassif

the Termination Notice, which indicated that the Fuel Supply Agreement, Lease Agreement and

Proprietary Marks Agreement would terminate on February 10, 2020.

85.     The February 3, 2020 Notice of Termination contained: (1) a statement of the

intention of Lehigh to terminate the Fuel Supply Agreement, Lease Agreement and Proprietary Marks

Agreement; (2) the reason for termination; (3) the date on which termination was to take effect; and

(4) a summary of the provisions of Title I of the Act which was prepared and published by the

Secretary of Energy pursuant to PMPA §2804(d)(1).

86.     The aforestated acts of Defendants MNR and Nassif constituted the occurrence of events relevant to the Fuel Supply Agreement, Lease Agreement and Proprietary Marks Agreement as a result of which termination was warranted, justified, reasonable and permitted under the parties' relevant agreements as well as pursuant to the PMPA.

87.     By virtue of the foregoing, the Plaintiffs' termination of their relationship with Defendants MNR and Nassif effective February 10, 2020 was valid and proper.

88.     Defendant MNR has refused to vacate the premises and, as such, has refused to recognize the validity of the termination of the Fuel Supply Agreement, Lease Agreement and Proprietary Marks Agreement.

89.     Plaintiffs are without any adequate remedy at law.

90.     Based upon the foregoing, Plaintiffs are entitled to an Order declaring the lawfulness of the termination the Fuel Supply Agreement, Lease Agreement and Proprietary Marks Agreement pursuant to the terms of the Fuel Supply Agreement, Lease Agreement and Proprietary Marks Agreement as well as the PMPA.

## COUNT VIII
## STATE LAW CLAIM FOR EVICTION AND EJECTMENT

91.     Plaintiffs repeat, reallege and reassert the allegations set forth in paragraphs "1" through "90" as if fully stated herein.

92.     Lehigh properly terminated the Fuel Supply Agreement, Lease Agreement and Proprietary Marks Agreement with Defendant MNR.

93.     The Fuel Supply Agreement, Lease Agreement and Proprietary Marks Agreement specified that, upon termination of the agreement, Defendant MNR would vacate the Premises immediately.

94.     Lehigh Gas Wholesale Services is, therefore, entitled to immediate possession of the

Premises.

95.     By virtue of the aforementioned acts of each of the Defendants, Plaintiffs have suffered and will continue to suffer damages and irreparable harm unless Defendants MNR and Nassif are preliminarily and permanently restrained by this Court from continuing to occupy said Premises and unless this Court exercises its pendant and/or ancillary jurisdiction and orders the ejectment, eviction and dispossession of Defendant MNR.

96.     Plaintiffs are without any adequate remedy at law.

## COUNT IX
## BREACH OF PERSONAL GUARANTY

97.     Plaintiffs repeat, reallege and reassert the allegations set forth in paragraphs "1" through "96" as if fully stated herein.

98.     Defendant Nassif has failed to satisfy the obligations of Defendant MNR under the Personal Guaranty attached to the Fuel Supply Agreement.

99.     Based upon all of the foregoing, Defendant Nassif is in material breach of the personal guaranties entered into by him.

100.    By virtue of Defendant Nassif's material breach of his personal guaranties, Plaintiffs have been damaged and will continue to be damaged in an amount that has not yet been finally determined but, in no case, less that the jurisdictional limit of this Court.

## RELIEF SOUGHT

**WHEREFORE**, Plaintiffs pray this Honorable Court for judgment as follows:

a.     Finding that Defendants MNR and Nassif have breached and continue to breach the Fuel Supply Agreement, Lease Agreement and Proprietary Marks Agreement;

b.     Finding that Defendants MNR and Nassif have committed and continue to commit trespass;

c.     Finding that Defendants MNR and Nassif have committed and continue to commit

conversion;

d.      Awarding monetary damages to the Plaintiffs for the Defendants' breaches of contract, trespass and conversion including, but not limited to, the recovery of all past and future rent, additional rent and other charges, and lost profits for sales at the site;

e.      Declaring that declaring that the termination of the Fuel Supply Agreement, Lease Agreement and Proprietary Marks Agreement was proper;

f.      Granting immediate and exclusive possession of the Premises to the Plaintiffs and preliminarily and permanently enjoining the Defendants, their agents, servants, employees, representatives and assigns, and all persons acting in concert or participation with them from accessing and/or trespassing on the Property or engaging in any conduct which would prevent the Plaintiffs' access to the Premises;

g.      Issuing a warrant mandating the ejectment and eviction of Defendant MNR, its agents, servants, employees, representatives and assigns, and all persons acting in concert or participation with it from the Premises;

h.      Finding Defendant Nassif personally liable for Defendant MNR's obligations;

i.      Awarding Plaintiffs their legal expenses, costs and reasonable attorneys' fees incurred in this action; and

j.      Granting such other and further relief as it deems appropriate under the circumstances.

Dated:  Armonk, New York
         April 22, 2020

Yours, etc.

/s/ Urs Broderick Furrer

**URS BRODERICK FURRER, ESQ.**
**HARRITON & FURRER, LLP**
Attorneys for Plaintiffs
84 Business Park Drive, Suite 302
Armonk, New York 10504
(914) 730-3400
BBO # 681287